COURT OF APPEALS
DECISION
DATED AND FILED

February 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1901-CR**

Cir. Ct. No. 2022CF173

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

TRAVIS B. TARVER,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Travis B. Tarver appeals a judgment of conviction, arguing that the circuit court erred by ordering him to pay the victim, Melissa,[1] $4,061.14 in restitution. For the reasons explained below, we affirm the restitution award in part, to the extent the court ordered Tarver to pay Melissa $1,361.14 for her lost wages.

¶2 However, we reverse the restitution award in part, to the extent the circuit court ordered Tarver to pay Melissa both her $200 car insurance deductible and $2,500, which the court determined to be the decrease in the value of Melissa's vehicle caused by Tarver's criminal activity. Under the relevant provision of the restitution statute, WIS. STAT. § 973.20(2)(am)2., the court was permitted to award Melissa only one of those amounts. In addition, as the State concedes, the evidence presented at the restitution hearing was insufficient to support the court's determination that Tarver's conduct caused a $2,500 decrease in the value of Melissa's vehicle.

¶3 Accordingly, we remand for the circuit court to decide which measure of restitution to award Melissa for Tarver's damage to her vehicle under WIS. STAT. § 973.20(2)(am)2. If the court decides to award Melissa the decrease in the vehicle's value, it must conduct further proceedings to properly determine the amount of that loss.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym instead of the victim's name. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## BACKGROUND

¶4      According to the criminal complaint, police were dispatched to a gas station in Grand Chute, Wisconsin, for a "weapons call." When they arrived, Melissa reported that "an unknown person shot at her vehicle [while] she was driving." Melissa then followed an officer to the police department, but while driving, she experienced "an asthma and/or anxiety attack" and had to pull over. She was subsequently able to continue driving to the police department.

¶5      At the police department, Melissa told an officer that while she was driving north in the left lane of Interstate Highway 41 that morning, a bronze car with no license plates and "blackened out windows" came up next to her vehicle on the passenger side, and she "had to speed up and move over to the right in front of the car … in order to get over for her exit." While she was in the far right lane, she heard "tink, tink, tink, tink, tink, tink, tink, tink" and believed someone had shot at her car.

¶6      An officer inspected Melissa's vehicle and "observed 13 areas of damage that appeared to be damage from a bullet, all on the driver's side of the vehicle," including "five small marks on the front fender, 4 marks/holes on the front door, 2 holes through the back door window, and 2 marks on the back door." The bullet holes were "consistent with a BB or pellet."

¶7      Using traffic cameras, the police tracked the bronze car to an address in the City of Appleton. Officers responded to that address and saw two men, one of whom was Tarver. Tarver entered the bronze car and started it. The officers then made contact with Tarver and the other man, and they saw "what appeared to be a revolver handgun on the wall of the garage." The other man told the officers that the gun was a BB gun, and "Tarver began stating he also had one that was in

the vehicle." Tarver's vehicle was later searched, pursuant to a warrant, and an officer found "a large AK-47 style black [BB] rifle on the backseat floor behind the front passenger seat." During a search of Tarver's person, an officer located "a small clear plastic bag that contained a green leafy substance" that the officer "believed to be THC."

¶8 The State charged Tarver with one count of first-degree recklessly endangering safety with use of a dangerous weapon, possession of THC as a second and subsequent offense, and criminal damage to property with use of a dangerous weapon. Pursuant to a plea agreement, Tarver entered a no-contest plea to the recklessly endangering safety charge, and the remaining counts were dismissed and read in. The circuit court sentenced Tarver to one year and ten months of initial confinement followed by five years of extended supervision.

¶9 At sentencing, the circuit court granted the State additional time to submit a request for restitution. The State subsequently requested $19,561.14 in restitution, comprised of: (1) Melissa's lost wages in the amount of $1,361.14; (2) $18,000 for the value of Melissa's vehicle; and (3) Melissa's $200 car insurance deductible. Tarver objected to the State's restitution request and asked for a hearing.

¶10 At the restitution hearing, Melissa testified that at the time of the shooting, she was employed by Northstar Logistics DHL as a courier and assistant manager. Her job required her to drive all day to make deliveries. She worked full time, at an hourly rate of $18.50. In addition, she typically worked four to five hours of overtime each day, at a rate of $27.75 per hour.

¶11 Melissa testified that she was not able to work on the day of the shooting, which was a Friday. She further testified that she was unable to work

4

from Monday through Friday the following week. She explained that she "wasn't in the right state of mind" and was "too afraid" to drive a vehicle, which was a necessary part of her job. When she returned to work, her employer "took [her] off the road" and transferred her to an "office" position "directly as a result" of the shooting. Melissa testified that she still struggled mentally with driving, particularly on "major highways."

¶12 On cross-examination, Melissa testified that her request for $1,361.14 in lost wages was based on "what [her] manager said that [she] would have been paid out" for the days of work that she missed following the shooting. Melissa confirmed that she was not physically injured during the shooting. When asked about her choice to take the week off following the shooting, Melissa testified:

> I chose to take it off, because I couldn't physically think straight. I cried for days. Literally cried … for days and fear not knowing why this gentleman did it to me. And the fact of that it even happened mentally and emotionally. I didn't leave my house even for a week and sat with my curtains closed, not knowing why I was targeted.

Melissa further testified that she saw a counselor for approximately two months after the shooting. She explained that she was not requesting restitution for the cost of that treatment because it was covered by her insurance.

¶13 Melissa also testified that her vehicle—a 2018 Ford Fusion—sustained "a lot of damage" as a result of the shooting. She took the vehicle to a body shop, which provided an estimate of approximately $1,900 to repair the damage. Melissa testified that she had a $200 car insurance deductible. She also submitted documentation from her car insurer, State Farm, showing that it paid her $1,927.11 to repair her vehicle.

¶14   Instead of having her vehicle repaired, however, Melissa testified that she decided to trade it in and purchase a different vehicle. She explained that following the shooting, she "couldn't drive [the vehicle] any more" and "didn't even want to look at it." She testified that the shooting was "a horrible incident" and that, afterwards, "[e]motionally, mentally [she] couldn't drive that car." Accordingly, Melissa traded in her vehicle to Klein Chevrolet Buick and purchased a Chevy Equinox for approximately $39,000. Klein gave her $16,500 as the trade-in value of her vehicle, and she gave Klein the $1,927.11 payment from State Farm for the vehicle's repair.

¶15   Melissa also testified that, in August 2021, she still owed $20,000 on the Ford Fusion, so she "rewrote [her] mortgage" to include that amount so that she "wouldn't have a car payment." As such, Melissa explained that following the shooting, she was still "paying … on [the] Ford Fusion through [her] mortgage," and she was also "making the same amount of money payments on" the Chevy Equinox.

¶16   During its oral ruling on restitution, the circuit court noted that it was relying on Melissa's testimony and was also taking "judicial notice of the history of the file, including the criminal complaint." The court then granted Melissa's request for $1,361.14 in lost wages. The court explained that "this was clearly a debilitating situation mentally. May not have been physically. But rippling effect of a mental impact can physically prevent a person [from going] to work." The court credited Melissa's testimony regarding the shooting's impact on her, and it also credited her testimony about receiving counseling after the shooting. The court therefore found that there was a "causal nexus" between Tarver's conduct and Melissa's claimed wage loss. The court further found that Melissa's six days

of missed work constituted a "modest period of time [off of work] when somebody is involved in a shooting as a victim."

¶17    The circuit court then stated that Melissa's request for restitution regarding her vehicle was "a little more complex, because even before the shooting, the Ford Fusion had value." The court explained:

> [A]t least circumstantially, the value of the Fusion, if she were to have traded it in a week ago, a week before the shooting, the [c]ourt's view and from circumstantial evidence and the panorama of all the evidence in this case, it would have more value and give her a better yield on the trade-in for the Equinox. The precision of calculating that is hard. There's a reduction in value because of the damage, but then there's a check given to compensate that. Doesn't ever make a vehicle whole or the same. I think that's just circumstantial evidence and common sense when somebody is trading in a vehicle.
>
> But there's an impact on whether the victim … would have gotten $20,000 in a trade-in versus $16,000 or $18,000. It's hard to be precise. We know at a minimum there's some value or reduction because of the significant damage involved. Costs roughly $1,900 and some to repair. May have been easy to calculate the difference if she had traded [it] in for a Fusion with roughly the same miles. But I don't fault her for picking a different car because of the reminder to her, even if she had prior history of loving that type of vehicle.

¶18    The circuit court then found "at least on the lower end that the value of the vehicle was reduced on a trade-in value" as a result of the damage caused by the shooting. The court acknowledged that this finding was based on "circumstantial evidence." However, the court determined, "from an equitable standpoint," that Melissa "roughly probably would have gotten at least another $2,500" for the Ford Fusion prior to the shooting.

¶19 Consequently, the circuit court awarded Melissa $2,500 for the decreased value of the Ford Fusion, along with her $200 car insurance deductible and $1,361.14 in lost wages. Tarver now appeals, challenging only the court's restitution award.

## DISCUSSION

¶20 Restitution is governed by WIS. STAT. § 973.20. The statute provides, in relevant part, that when sentencing a defendant for a crime, the circuit court "shall order the defendant to make full or partial restitution under this section to any victim of a crime considered at sentencing … unless the court finds substantial reason not to do so and states the reason on the record." Sec. 973.20(1r). "The primary purpose of restitution is not to punish the defendant, but to compensate the victim." *State v. Madlock*, 230 Wis. 2d 324, 332, 602 N.W.2d 104 (Ct. App. 1999). As such, we construe the restitution statute "broadly and liberally in order to allow victims to recover their losses as a result of a defendant's criminal conduct." *Id.* (citation omitted).

¶21 A request for restitution is addressed to the circuit court's discretion, and we will reverse a restitution award only if the court erroneously exercised its discretion. *Id.* at 329. A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a demonstrated rational process to reach a reasonable conclusion. *LeMere v. LeMere*, 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789. Our review of a circuit court's discretionary decisions may involve underlying questions of law and fact. *See Covelli v. Covelli*, 2006 WI App 121, ¶13, 293 Wis. 2d 707, 718 N.W.2d 260. We review any questions of law independently, but we will not disturb the circuit court's factual findings unless they are clearly erroneous. *See id.* Whether the

restitution statute provides a circuit court with the authority to order restitution under a given set of facts is a question of law. *State v. Haase*, 2006 WI App 86, ¶5, 293 Wis. 2d 322, 716 N.W.2d 526.

¶22    A victim seeking restitution must establish the existence of a "causal nexus" between a crime considered at sentencing and his or her claimed damage. *State v. Canady*, 2000 WI App 87, ¶9, 234 Wis. 2d 261, 610 N.W.2d 147. A crime considered at sentencing "means any crime for which the defendant was convicted and any read-in crime." WIS. STAT. § 973.20(1g)(a). To establish the requisite causal nexus, the victim "must show that the defendant's criminal activity was a 'substantial factor' in causing" the victim's claimed damage. *Canady*, 234 Wis. 2d 261, ¶9 (citation omitted). In other words, "[t]he defendant's actions must be the 'precipitating cause of the injury' and the harm must have resulted from 'the natural consequence[s] of the actions.'" *Id.* (citation omitted). The victim must also prove, by a preponderance of the evidence, "the amount of loss" that he or she sustained "as a result of a crime considered at sentencing." Sec. 973.20(14)(a).

## I. Lost wages

¶23    Tarver argues, for two reasons, that Melissa was not entitled to recover her lost wages from the week following the shooting.[2] First, Tarver contends that Melissa failed to establish a causal nexus between her lost wages

---

[2] In the circuit court, Tarver agreed that Melissa was entitled to recover her lost wages from the day of the shooting. On appeal, Tarver appears to challenge only the circuit court's award of lost wages for the week following that date. We agree with Tarver's apparent concession that Melissa was entitled to recover her lost wages from the day of the shooting because she was cooperating with law enforcement's investigation in the hours following the incident, which prevented her from going to work. *See* WIS. STAT. § 973.20(5)(b).

during the week following the shooting and a crime considered at sentencing. Second, Tarver asserts that the restitution statute did not authorize the circuit court to award Melissa her lost wages under the facts of this case. We reject both of these arguments.

¶24    The circuit court did not erroneously exercise its discretion by concluding that a causal nexus existed between Melissa's lost wages from the week following the shooting and the crimes considered at sentencing. *See State v. Johnson*, 2005 WI App 201, ¶10, 287 Wis. 2d 381, 704 N.W.2d 625 (explaining that a circuit court has discretion to determine "whether the defendant's criminal activity was a substantial factor in causing any expenses for which restitution is claimed"). Tarver was sentenced for shooting Melissa's vehicle with a BB gun while they were both driving on Interstate Highway 41. The criminal complaint—of which the circuit court took judicial notice—recounted that after the shooting, Melissa experienced "an asthma and/or anxiety attack" on her way to the police department and had to pull over. Melissa testified at the restitution hearing that following the shooting, she "cried for days" and was "too afraid" to drive a vehicle. She explained that she did not leave her house for a week and did not know "why [she] was targeted." She further testified that she participated in counseling sessions for about two months after the shooting. Melissa also testified that her work as a courier required her to drive every day and that, after she missed work during the week following the shooting, her employer reassigned her to an office job.

¶25    On this record, the circuit court could reasonably conclude that Tarver's criminal activity was a substantial factor in causing Melissa to miss work, and therefore lose wages, during the week following the shooting. Melissa's testimony—which the court credited—established that she was unable to return to

her job as a courier during that week because Tarver's conduct made her too afraid to drive. Stated differently, Melissa's testimony showed that Tarver's criminal activity "set into motion events that resulted in the damage or injury." *See State v. Hoseman*, 2011 WI App 88, ¶26, 334 Wis. 2d 415, 799 N.W.2d 479 (citation omitted).

¶26 Tarver argues that Melissa failed to establish the requisite causal nexus between her lost wages and his conduct because she did not provide "documentation from a doctor to corroborate any mental health impairments." Similarly, Tarver argues in his reply brief that Melissa failed to present "medical records, … physical or psychological assessments, documented therapy sessions, [or] any other records that could prove that she was experiencing such an extreme amount of mental anguish that she was *unable* to work." Instead, Tarver argues the evidence merely showed that Melissa "did not *want* to work."

¶27 This argument is unpersuasive. Tarver cites no legal authority in support of the proposition that Melissa was required to present medical records, psychological assessments, or other documentation to support her claim that, as a result of Tarver's conduct, she was too afraid to drive and therefore could not work during the week following the shooting. Instead, Melissa presented her own testimony on that subject, which the circuit court credited. When acting as the fact finder, the circuit court is "the ultimate arbiter of the credibility of witnesses," and "its credibility determinations will not be upset unless clearly erroneous." *State v. Bermudez*, 221 Wis. 2d 338, 346, 585 N.W.2d 628 (Ct. App. 1998). Here, there is

nothing in the record to suggest that the court's credibility determination regarding Melissa's testimony was clearly erroneous.[3]

¶28   Next, Tarver argues that even if Melissa established the requisite causal nexus between his conduct and her lost wages, the restitution statute did not authorize the circuit court to award Melissa her lost wages for the week following the shooting.  Again, we disagree.

¶29   A restitution order may require the defendant to "[p]ay all special damages, but not general damages, substantiated by evidence in the record, which could be recovered in a civil action against the defendant for his or her conduct in the commission of a crime considered at sentencing."  WIS. STAT. § 973.20(5)(a).  "General damages under the criminal restitution statute are those that 'compensate the victim for damages such as pain and suffering, anguish or humiliation,' damages crime victims often experience."  *State v. Holmgren*, 229 Wis. 2d 358, 365, 599 N.W.2d 876 (Ct. App. 1999) (citation omitted).  General damages "are not readily susceptible to direct proof or 'easily estimable in monetary terms.'"  *State v. Stowers*, 177 Wis. 2d 798, 804-05, 503 N.W.2d 8 (Ct. App. 1993) (citation omitted).

---

[3] In his reply brief, Tarver asserts that his "use of a nonlethal, legal, [BB] gun style toy to cause property damage to [Melissa's] car is not reasonably the 'equivalent' experience as a literal shooting with actual injuries or death."  At the time of the shooting, however, Melissa was not aware that the weapon used to shoot her car was "only" a BB gun.  Furthermore, even if Melissa learned shortly after the shooting that the weapon was a BB gun, we do not accept Tarver's assertion that such knowledge necessarily would have lessened Melissa's emotional distress to the point where she would have been able to go to work.  A stranger shot at Melissa's vehicle while she was driving on an interstate highway, which was unquestionably a dangerous and distressing situation—even if the weapon involved was "only" a BB gun.

¶30 Special damages, in contrast, "encompass 'harm of a more material or pecuniary nature' and represent the victim's actual pecuniary losses." *Holmgren*, 229 Wis. 2d at 365 (citation omitted). "Any readily ascertainable pecuniary expenditure paid out because of the crime is appropriate as special damages." *Id.* "Thus, the ultimate question in deciding whether an item of restitution is 'special damages' within the meaning of the [restitution] statute is whether the item is a readily ascertainable pecuniary expenditure attributable to the defendant's criminal conduct that could be recovered in any type of civil action." *Johnson*, 287 Wis. 2d 381, ¶12.

¶31 "Lost wages are a type of special damages." *State v. Muth*, 2020 WI 65, ¶50, 392 Wis. 2d 578, 945 N.W.2d 645; *see also State v. Walters*, 224 Wis. 2d 897, 906, 591 N.W.2d 874 (Ct. App. 1999) (stating that "lost earnings" are a "type[] of special damages"); *Stowers*, 177 Wis. 2d at 805 (citing "loss of … earnings" as an example of special damages). This conclusion makes sense, as a crime victim's lost wages caused by a defendant's criminal activity are "a readily ascertainable pecuniary expenditure attributable to the defendant's criminal conduct." *See Johnson*, 287 Wis. 2d 381, ¶12. Moreover, Tarver does not dispute, as a general matter, that lost wages are a type of damages that could be recovered in a civil action.[4] *See* WIS. STAT. § 973.20(5)(a). As such, under § 973.20(5)(a), the circuit court had authority to award Melissa her lost wages for the week following the shooting.

---

[4] In his reply brief, Tarver contends that Melissa failed to prove that she "*would have recovered* her lost wages in a civil action." (Emphasis added.) The restitution statute, however, permits an award of special damages that "*could be recovered* in a civil action against the defendant." WIS. STAT. § 973.20(5)(a) (emphasis added).

¶32    In arguing to the contrary, Tarver emphasizes that general damages "compensate the victim for damages such as pain and suffering, anguish or humiliation." *See* ***Holmgren***, 229 Wis. 2d at 365 (citation omitted). Tarver therefore contends that Melissa's lost wages are general damages, rather than special damages, because "they stemmed from her mental anguish and suffering preventing her from working." This argument lacks merit. The circuit court's award of lost wages did not compensate Melissa for her "mental anguish and suffering." Instead, the award compensated Melissa for a readily ascertainable pecuniary loss—that is, the wages that she lost when she missed work as a result of Tarver's criminal conduct.

¶33    Tarver also argues that because a victim's lost wages are recoverable in specific circumstances under other provisions of the restitution statute, *see, e.g.*, WIS. STAT. § 973.20(3), (5)(b), we may not interpret § 973.20(5)(a) to permit an award of lost wages under other circumstances. However, our interpretation of § 973.20(5)(a) is dictated by that paragraph's plain language and by binding Wisconsin precedent. Section 973.20(5)(a) unambiguously permits a circuit court to award as restitution "all special damages … substantiated by evidence in the record, which could be recovered in a civil action against the defendant for his or her conduct in the commission of a crime considered at sentencing." As discussed above, Wisconsin case law clearly holds that lost wages are special damages. We are not permitted to disregard that binding authority. *See* ***Cook v. Cook***, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997).

¶34    Consequently, we reject Tarver's argument that the circuit court erred by awarding Melissa her lost wages for the week following the shooting. We therefore affirm that portion of the restitution award requiring Tarver to pay Melissa $1,361.14 in lost wages.

## II. Damage to Melissa's vehicle

¶35     Tarver also challenges the circuit court's award of restitution to Melissa to compensate her for damage to her vehicle. He concedes that Melissa is entitled to recover her $200 car insurance deductible to compensate her for the reasonable cost to repair her vehicle.[5] He argues, however, that Melissa is not "also entitled to recover the loss in [the vehicle's] value when she has already been compensated for the reasonable repair costs." He further argues that the evidence submitted at the restitution hearing was insufficient to support the court's determination that Melissa's vehicle decreased in value by $2,500 as a result of his conduct.

¶36     The State, in turn, asserts that the circuit court "properly ordered restitution for the lost trade-in value of [Melissa's] vehicle" under WIS. STAT. § 973.20(2)(am)2. The State concedes, however, that the evidence introduced at the restitution hearing did not sufficiently support the court's award of $2,500. Citing *State v. Kayon*, 2002 WI App 178, 256 Wis. 2d 577, 649 N.W.2d 334, the State therefore asks us to "remand the case to the circuit court to hold an evidentiary hearing to provide a substantiated record and determine the proper restitution amount for the [vehicle's] lost trade-in value."

---

[5] In his brief-in-chief, Tarver argues that Melissa failed to prove that the cost to repair her vehicle "could be attributed to [his] criminal conduct." In his reply brief, however, Tarver concedes that Melissa "is entitled to the $200 deductible paid to her insurance to cover the costs of repair." Similarly, in the circuit court, Tarver conceded that Melissa was entitled to recover her $200 deductible.

15

¶37    We agree with Tarver that the circuit court erred by awarding Melissa both her $200 car insurance deductible and an additional amount for the vehicle's decreased value.  The restitution statute provides, in relevant part:

> If a crime considered at sentencing resulted in damage to or loss or destruction of property, the restitution order may require that the defendant:
>
> 1. Return the property to the owner or owner's designee; or
>
> 2. If return of the property under subd. 1 is impossible, impractical or inadequate, pay the owner or owner's designee the reasonable repair *or* replacement cost *or* the greater of:
>
> a. The value of the property on the date of its damage, loss or destruction; *or*
>
> b. The value of the property on the date of sentencing, less the value of any part of the property returned, as of the date of its return.  The value of retail merchandise shall be its retail value.

WIS. STAT. § 973.20(2)(am) (emphasis added).

¶38    In this case, it is undisputed that the "return" of Melissa's property was "impossible, impractical or inadequate."  *See* WIS. STAT. § 973.20(2)(am)2. As such, under the statute's plain language, to compensate Melissa for the damage to her vehicle caused by Tarver's conduct, the circuit court could order Tarver to pay *one of* the following: (1) the reasonable cost to repair the vehicle; (2) the reasonable cost to replace the vehicle; or (3) the greater of the vehicle's value on the date of the damage or the vehicle's value on the date of sentencing.  *See id.* The statute did not permit the court to award Melissa *both* her $200 car insurance deductible to compensate her for the reasonable cost to repair her vehicle *and* an additional amount to compensate her for the vehicle's decreased value.

16

¶39     We also agree with both parties that the evidence introduced at the restitution hearing was insufficient to support the circuit court's determination that Melissa's vehicle decreased in value by $2,500 as a result of Tarver's conduct. Melissa testified that she owed $20,000 on the vehicle in August 2021, but there was no testimony about what she paid for the vehicle when she purchased it. There was also no evidence regarding what the trade-in value for a similar vehicle would have been absent the damage caused by the shooting. The evidence showed that Melissa received $16,500 as the trade-in value of the vehicle and that she gave the dealership the money that she received from State Farm. But without evidence about what the vehicle's trade-in value would have been absent the shooting, the court's award of $2,500 for the vehicle's lost trade-in value was purely speculative.

¶40     We therefore reverse the circuit court's restitution award in part, to the extent the court ordered Tarver to pay Melissa both her $200 car insurance deductible and $2,500 for the decrease in her vehicle's value caused by the shooting. We agree with the State that, under these circumstances, a remand for further proceedings is appropriate. *See **Kayon***, 256 Wis. 2d 577, ¶¶10-12 (reversing a restitution award and remanding for further proceedings where the appellate court determined that the circuit court properly awarded a particular item of restitution, but the record was insufficient to support the amount awarded). On remand, the court must decide which measure of restitution to award Melissa for Tarver's damage to her vehicle under WIS. STAT. § 973.20(2)(am)2. If the court decides to award Melissa the decrease in her vehicle's value, it must conduct further proceedings to properly determine the amount of that loss.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.